[No. 12641.  In Bank. — December 3, 1891.]

MARGARET C. WHEELER, RESPONDENT, *v.* JAMES R. BOLTON, APPELLANT.

APPEAL — REVIEW OF ORDER DENYING NEW TRIAL — GROUNDS OF MOTION — CONCLUSIONS OF LAW — SUFFICIENCY OF FINDINGS. — Upon appeal from an order denying a new trial, the appellate court is limited to a review of the action of the court upon the grounds upon which the new trial was asked, and can determine whether the conclusions of law are correctly drawn from the findings of fact, or whether the findings sustain the judgment, only upon an appeal from the judgment.

ID. — LAW OF CASE — APPEALS INVOLVING DIFFERENT MATTER. — The law of the case, as established by opinions upon former appeals from a judgment on demurrer to a complaint, and from an order granting a new trial after a judgment of nonsuit, has no relevancy in determining upon a subsequent appeal from an order denying a new trial whether the court erred in admitting or excluding evidence or made its findings without sufficient evidence to support them.

EXECUTORS AND ADMINISTRATORS — NEGLIGENCE — LOSS OF PROPERTY OF DECEDENT — FINDINGS — ERRONEOUS VALUATION. — In an action by a devisee against an executor to recover the value of land of which it is alleged that the defendant, in violation of his duties as executor, did not safely keep and protect the possession, but allowed and permitted himself to be dispossessed, and the property and title lost to plaintiff, where the court finds that the original claim of the decedent was for a seventy-two-acre tract of land valued in the inventory as an entirety at a specified sum, and that the decedent was the owner of only forty-two acres of the tract, it is error for the court to take as the basis of the defendant's liability the valuation given in the inventory of the seventy-two-acre tract.

| 92 | 159 |
|----|-----|
| 100 | 616 |
| 92 | 159 |
| 111 | 446 |
| 92 | 159 |
| 120 | 461 |
| 92 | 159 |
| 121 | 472 |
| 92 | 159 |
| 123 | 333 |
| 92 | 159 |
| 125 | 272 |
| 92 | 159 |
| 127 | 132 |
| 92 | 159 |
| 141 | 166 |

ID. — INVENTORY — APPRAISED  VALUE — PRIMA  FACIE  PROOF — UNDE-
SCRIBED PART OF DESCRIBED TRACT — INADMISSIBLE EVIDENCE OF VALU-
ATION. — Although an executor or administrator is chargeable with the
whole of the estate of the decedent which may have come into his posses-
sion at the value of the appraisement contained in the inventory, unless
he shall exonerate himself as provided by the statute, the inventory is
only *prima facie* evidence of the value of the estate specifically described
therein, and is not admissible as evidence against the executor or ad-
ministrator of the value of a tract of land not therein specifically de-
scribed or valued, though it is part of an entire tract which has a specific
description and valuation.

ID. — BURDEN OF PROOF — NEGLIGENCE — VALUE. — If the heir or devisee
seeks to charge an executor for negligence in not taking or retaining
possession of property belonging to the estate, the burden is upon the
complainant to establish such negligence, and to present competent proof
of the value of the property lost to the estate.

ID. — LIABILITY OF EXECUTOR — MEASURE OF DAMAGES — VALUE AT DATE
OF LOSS — LAPSE OF TIME. — An executor is *prima facie* liable for only
such assets as come into his possession. His liability for negligence is
measured by the detriment actually sustained by the estate therefrom;
and if the executor has not profited by his acts or been guilty of willful
misfeasance, the value of the property at the date of the loss is the meas-
ure of the right of recovery, whether the property be real or personal;
and the amount of recovery cannot be increased by mere lapse of time,
or by neglect of the parties interested to call him to account for the
loss.

ID. — VALUE SUBSEQUENT TO LOSS — EVIDENCE — FINDINGS. — Testimony
offered and a finding made as to the value of a tract of land at a date
long subsequent to the date of the alleged loss thereof by the executor
is immaterial, and cannot be taken as the measure of the executor's lia-
bility for the loss sustained.

ID. — COMPOUND INTEREST, WHEN NOT ALLOWABLE. — An executor or
trustee cannot be charged with compound interest, except in cases where
he has been guilty of some positive misconduct or willful violation of
duty; and though he is presumably chargeable with compound interest
where he has mingled the funds of the estate with his own, yet if he
can show that he has acted in good faith, and has made no greater profit
by their use, he will be charged only simple interest. In cases of mere
negligence, compound interest cannot properly be added to the loss or
damage resulting therefrom.

ID. — ALLOWANCE OF SIMPLE INTEREST — LOSS BY NEGLIGENCE — QUESTION
OF FACT. — The rule allowing interest to be charged against an executor is
limited to cases in which it is either shown or presumed that the executor
has himself profited by his acts, or has been guilty of willful malfeasance;
and whether he can be charged with even simple interest in case of loss
by negligence must be determined by the trial court from the circum-
stances of the case.

ID. — TECHNICAL NEGLECT — NEGLIGENCE OF CLAIMANT. — No interest
should be allowed in addition to the value of property lost to the estate
by the negligence of the executor, where the circumstances show that his
neglect has been merely technical, and not wanton or willful, or pro-

ductive of profit to the executor, and the complainant has been negligent in prosecuting his claim.

APPEAL from an order of the Superior Court of the city and county of San Francisco denying a new trial.

The facts are stated in the opinion of the court.

*Daniel Rogers,* and *Philip G. Galpin,* for Appellant.

Bolton acted in good faith, and could not be charged with the loss of possession, except upon clear proof of gross neglect. (*Deas* v. *Spann,* 1 Harp. 176; 3 Williams on Executors, 1800–1804, note.) Bolton was not liable for property lost, by the statute of limitations, unless he was guilty of fraud or willful neglect. (*Thomas* v. *White,*. 3 Litt. 177; 14 Am. Dec. 56.) The damages are excess-- ive, for the reason that interest has been computed with annual rests for nearly forty years, while the legatee at any time after 1872 could have brought her action of ejectment and recovered the land. (Code 1872, sec. 1452; 3 Williams on Executors, 1845.) Compound in- terest will not be allowed where the act is one of sim-- ple carelessness. (Perry on Trusts, sec. 472; *Adams* v.. *Lambard,* 80 Cal. 426; *Garniss* v. *Gardiner,* 1 Edw. Ch. 129; *Wright* v. *Wright,* 2 McCord Eq. 200–204; *Acker-- man* v. *Emott,* 4 Barb. 649.) The laches of plaintiff' ought to bar all relief, even if laches is not pleaded. (*Harris* v. *Hillegass,* 66 Cal. 79.) The decree of April 12, 1876, bars all claims for negligence. (Code Civ. Proc., sec. 1637; *Reynolds* v. *Brumagim,* 54 Cal. 257; *Estate of Stott,* 52 Cal. 406; *Tilton* v. *Tibbets,* 24 N. H. 120; 3 Redfield on Wills, 307–312; *Beall* v. *New Mexico,*. 16 Wall. 535; *Casoni* v. *Jerome,* 58 N. Y. 315.) The de- cree and proceedings in the probate court in July, 1852, absolved the executors from further duty to guard the estate, and Bolton is not chargeable for neglect after' that date. For neglect prior to that date he should have been charged on that accounting.. There may be several final accountings. (*Glover* v. *Holley,* 2 Bradf. 291; *Reynolds* v. *Brumagim,* 54 Cal. 257; *Grady* v. *Por- ter,* 53 Cal. 680.)

*Oliver P. Evans,* and *Cope & Boyd,* for Respondent.

When defendant qualified as executor, and inventoried the property belonging to the Carman estate, he assumed to be, and was, in possession of all the property inventoried as part of the estate, to the same extent and in the same manner as the deceased was at the time of his death, no adverse holding having intervened. Bolton, as executor, having inventoried the property as part of the estate, and having subsequently accounted for it in one of his statements to the probate court in 1852, must, after the lapse of so many years, be held to have acted in accordance with the then existing law. That the law imposed upon the executor the duty of taking and keeping possession of the estate, there can be no doubt. (Stats. 1850, sec. 115, p. 386; sec. 195, p. 393; Stats. 1851, sec. 114, p. 461, sec. 194, p. 473. See also Code Civ. Proc., secs. 1443, 1452.) The order of the probate court of July 12, 1852, did not release the defendant from liability for damages for malfeasance in office, as it was not a final account, and did not purport to discharge Bolton as executor. Moreover, it is void upon its face, as it nowhere appears that such preliminary steps in the way of petition and notice as were requisite to confer jurisdiction were ever taken. (Stats. 1851, secs. 233, 238, pp. 478, 479; *McClellan* v. *Downey,* 63 Cal. 522, 523.) Under the act of 1851, the probate court was a court of inferior and limited jurisdiction, with no presumptions in favor of its records or jurisdiction. (Belknap's Probate Law, 3d ed., 2; *Townsend* v. *Gordon,* 19 Cal. 205, 206.) Bolton could only be discharged after a distribution of the estate. (Stats. 1851, sec. 279, p. 484.) Until the entry of a formal decree discharging an executor, his liability and the trust continue. (*Dohs* v. *Dohs,* 60 Cal. 255; *McCrea* v. *Haraszthy,* 51 Cal. 146, 151.) The decree of April 12, 1876, approved the executor's report " as to all matters except real estate," and therefore did not exonerate him from liability for the loss of the real property of the

estate; and such liability was a proper matter of consideration here. The contention that he could not be made responsible except in the probate court cannot be sustained. (See *Wheeler* v. *Bolton*, 54 Cal. 302.) Prior to the adoption of the code, the plaintiff could not have maintained an action to recover the possession of this land. The right of possession was in the executors, and they alone could maintain an action for its recovery. (*Chapman* v. *Hollister*, 42 Cal. 462; *Meeks* v. *Kirby*, 47 Cal. 168; *McCrea* v. *Haraszthy*, 51 Cal. 146; *Healy* v. *Buchanan*, 34 Cal. 569; *Salmon* v. *Wilson*, 41 Cal. 595.) The statute of limitations became a bar to any action to recover the property on the 11th of April, 1860. (Stats. 1855, p. 109; *Billings* v. *Harvey*, 6 Cal. 381; *Billings* v. *Hall*, 7 Cal. 1; *Clarke* v. *Huber*, 25 Cal. 596.) The appraisement was of the claim as it stood. Possession of public land in this state has uniformly been treated as property. The inventory and appraisement, together with the written admission, are at least *prima facie* evidence. (Schouler on Executors, sec. 236; *Boggan* v. *Walter*, 12 Smedes & M. 666; *Estate of Loeben*, Myrick's Prob. Rep. 203; *Hoover* v. *Miller*, 6 Jones, 79; *Willoughby* v. *McCluer*, 2 Wend. 609.) Executors are liable in damages for negligence and misconduct. (Schouler on Executors, secs. 312, 316, 382–384; *Schultz* v. *Pulver*, 3 Paige, 182; affirmed on appeal, 11 Wend. 363; *Tobbs* v. *Carpenter*, 1 Madd. 298; *Dean* v. *Rathbone*, 15 Ala. 328; *Harris* v. *Parker*, 41 Ala. 604; *Powell* v. *Evans*, 5 Ves. 832; *Estate of Long*, 6 Watts, 46; *Scarborough* v. *Watkins*, 9 B. Mon. 540; 50 Am. Dec. 528; *Stark* v. *Hunton*, 3 N. J. Eq. 300; *Holmes* v. *Budgman*, 57 Vt. 28; *Skrie* v. *Simmons*, 11 Ga. 401; *Patton* v. *Gregory*, 21 Tex. 513; *Wheeler* v. *Bolton*, 66 Cal. 83.)

HARRISON, J. — William L. Carman died in San Francisco September 7, 1850, leaving a last will and testament, by which he devised and bequeathed all his estate to the plaintiff, and appointed the defendant and one Adams his executors. The will was admitted to pro-

bate January 10, 1851, and on the 20th of that month the executors qualified and entered upon the duties of their office.   Carman, in his lifetime, had caused to be surveyed a tract of about seventy-two acres of land, in the form of a parallelogram, in the vicinity of Mission and Twenty-third streets, in San Francisco, to which he made claim, and on which he made certain improvements.   About thirty acres of this tract lay to the west of the San José road, and was subsequently ascertained to be included within the limits of the Noe grant, while the remainder, about forty-two acres in extent, was a part of the pueblo lands of San Francisco, and outside of the lands covered by the Van Ness ordinance.   After the executors had qualified, they caused an inventory of the assets of the estate, with an appraisement thereof, to be prepared and filed in the probate court, and in said inventory was included, as a part of the assets of the estate, " seventy-two acres of land at the Mission Dolores, to which the deceased had a pre-emption right," which was appraised at six thousand dollars.   The court finds that the defendant never had the actual possession of any part of the seventy-two-acre tract of land, and it appears from the evidence that soon after Carman died one Green took possession of that portion lying to the east of the San José road, and that the same has since been held adversely by him, and those claiming under him.   The court also finds " that at the death of said Carman, and for a long time thereafter, to wit, until the first day of January, 1852, there was no adverse holding or possession of the said forty-two acres of said Carman tract lying to the east of said San José road which could have prevented the defendant, as executor of said estate as aforesaid, from taking possession as such executor of the said last-mentioned tract of land."

Prior to any claim by Carman of this tract of land, viz., April 11, 1850, the defendant had purchased the Santillan grant to a tract of land comprising about three square leagues, in the vicinity of the Mission Dolores,

which embraced the lands subsequently claimed by Car-
man, and on the 13th of July, 1853, he conveyed this
tract so purchased to one George W. Wright, by an in-
strument in which the sum of two hundred thousand
dollars was expressed as the consideration.   It does not
appear that any possession under this grant was ever
had by the defendant, or taken by Wright under the
conveyance to him, and the grant itself was subsequently
adjudged to be fraudulent.   June 30, 1852, the defend-
ant filed an account in the probate court containing a
statement of his receipts and disbursements in the ad-
ministration of the estate, in which, under the heading
of "Statement of property embraced in the inventory of
the appraisers" was the item "seventy-two acres of land
situate at the Mission Dolores, to which the deceased
held a pre-emption right, etc., valued at six thousand
dollars"; and under the heading "Statement of disposi-
tion of the same property by the executors" was the
item "No disposition has been made of this property, in
consequence of a question of title now before the United
States land commission."   This account was settled and
allowed by the court July 12, 1852, and an order made
canceling the bonds of the executors, and directing
them to forward to the plaintiff the money in their
hands, $61.06, belonging to the estate, which was done
August 25, 1852.   This was treated by the executors as
a close of their administration of the estate, and nothing
further was done therein until July 17, 1875, when, upon
the petition of the plaintiff, the defendant (his co-execu-
tor having left the state) was cited to appear before the
probate court and render a final account in the matter
of said estate.   Such account was rendered by him Sep-
tember 23, 1875, and was settled by an order of the court
as of December 13, 1875.   Thereafter, on the 17th of
April, 1876, upon the petition of the plaintiff, the pro-
bate court made a decree of distribution in said estate,
in which it "adjudged and decreed that the said real es-
tate as described in the inventory of said estate and the
account therein filed on the tenth day of June, 1852, be

and the same is hereby distributed, to wit, seventy-two (72) acres of land situated at the Mission Dolores, to which the deceased held a pre-emption right, be and the same is hereby distributed to Margaret C. Wheeler, sole legatee under and by virtue of the will of said William L. Carman, deceased." In its finding upon this point, the court below, referring to the decree of distribution, states that in said decree " the plaintiff was adjudged to be entitled to the possession of said real estate, and the defendant required to surrender and deliver the possession of the same to the plaintiff"; but this portion of the finding must be disregarded, as it is contradicted by the terms of the decree itself, wLich is set out at length in the same finding.

The plaintiff commenced this action December 23, 1876, to recover from the defendant the sum of four hundred thousand dollars, alleging in her complaint that the said seventy-two acres of land were then of that value, and were of the value of about six thousand dollars at the date of Carman's death, and that the defendant, " in violation of his duties as executor, did not safely keep, retain, and protect his possession of this land, but allowed and permitted himself to be dispossessed, and the property and title lost to the plaintiff." The action was tried by the court, and in its findings, in addition to the foregoing facts, the court found " that the said sum of six thousand dollars was the true value of the said claim of the said Carman to the said seventy-two (72) acres of land at the time of said appraisement and valuation, and at all times thereafter to and including the thirteenth day of July, 1853"; and found that the plaintiff had sustained damages for which the defendant is responsible in the sum of one hundred and nine thousand dollars, — stating in its finding that "the damages are estimated on the basis of six thousand dollars ($6,000) as the value of the claim or interest of the estate on the thirteenth day of July, 1853, and adding thereto legal interest from said day until the present time, computed with annual rests." Judgment was

thereupon entered in accordance with the findings, a motion for a new trial made by the defendant was denied, and from the order denying a new trial the defendant has appealed.

The case has been before this court on two former appeals, the first from a judgment rendered on sustaining a demurrer to the complaint (54 Cal. 302), and the second from an order granting a new trial after a judgment of nonsuit. (66 Cal. 83.) As the present appeal is only from the order denying a new trial, we are limited in our consideration thereof to a review of the action of the court upon the grounds upon which the new trial was asked. Whether the conclusions of law are correctly drawn from the findings of fact, or whether the findings sustain the judgment entered thereon, can be examined only upon an appeal from the judgment. Nor are we required upon this appeal to determine what is the law of the case, as established by the opinions upon the former appeals, or whether the allegations of the complaint were sustained by the evidence offered at the trial, as neither of these questions has any relevancy in determining whether the court committed error in admitting or excluding evidence, or made its findings of fact without sufficient evidence to support them. (*Brison* v. *Brison*, 90 Cal. 323.)

The finding of the court "that the said sum of six thousand dollars was the true value of the said claim of the said Carman to the said seventy-two acres of land at the time of said appraisement and valuation, and at all times thereafter to and including the thirteenth day of July, 1853," rests for its support entirely upon the valuation placed thereon in the inventory filed by the executors, and the statement thereof by the defendant in his account filed June 30, 1852. The inventory itself was not offered in evidence, as it could not be found, nor was there any copy produced, although it appeared from one of the letters of the defendant to the plaintiff that he had sent her a copy. The court found, however, that the inventory was made and filed by the executors prior

to June 30, 1852, and that in it they set forth, as a part of the assets of said estate, " seventy-two acres of land at the Mission Dolores, to which the deceased had a pre-emption right," and that the value of the land as stated therein was six thousand dollars.

It must be considered that at the time when Carman caused this tract of land to be surveyed, and laid claim thereto, there was very great uncertainty, if not entire ignorance, concerning the character of title to any of the land in that portion of San Francisco. With the ideas brought with them from the older states, individuals sought to appropriate by possession whatever land they deemed necessary for themselves, — a common idea being that 160 acres was the limit to any claim they might make. The witness Hoadley testified: " There wasn't any land in San Francisco but what there was a cloud about it, unless there was a few old Spanish grants made before the American occupation "; and again, " in those days a man took up what he could get, and hung onto it, and that is about the way of it. I suppose they got title the same as I did mine, — the 160 acres." Congress did not, until March 3, 1851, pass the act for the purpose of settling land titles in California, and the pre-emption laws of the United States were not extended to California until 1853; nor was there any law, either state or federal, by which a person could acquire title to any of the public land. Although it was understood that Mexican grants had been made for lands in San Francisco, yet the boundaries of these grants were not defined, nor had their validity been established. The Santillan claim, which was then of great notoriety, although its validity was disputed, and it was afterwards rejected as fraudulent, covered the whole of this region. The Noe grant, above referred to, was not surveyed until after Carman's death, and it does not appear that it was at any time inclosed, or that there was anything to indicate its boundaries. One of the results of this uncertainty and ignorance of title was, that those who sought to appropriate to themselves portions of what

they may have supposed to be public land located their claims in part upon lands which afterwards proved to be within a Mexican grant, as was done by Carman in the present instance.

The Carman claim for seventy-two acres appears to have always been treated as an entirety. There is nothing in the record to indicate that any distinction was ever made, either in value or character of title, in the lifetime of Carman, or at any time afterwards, during the administration of his estate, between the portion included within what was afterwards determined to be a part of the Noe grant and the portion east of the San José road. It was included in the inventory, and valued by the appraisers as a single tract of seventy-two acres of land, and was valued as an entirety at the sum of six thousand dollars.

The finding that the tract on the east of the road was inclosed does not affect this proposition, for the court does not find that Carman inclosed this tract, and there is no evidence that Carman himself ever built or authorized the building of any fence or inclosure whatever. The court finds that he "caused to be surveyed and claimed to own" the seventy-two-acre tract, and the witness Brown testified that at the time of his death the whole seventy-two-acre tract was inclosed. The finding of the court that Carman was not the "*owner* of, nor seised or possessed of," any part of the seventy-two acres that was within the Noe grant relates to facts ascertained after Carman's death, and does not qualify the fact that he claimed the whole, or that he at all times supposed that his title to that portion of his claim was the same as his title to the other portion, or that the sum of six thousand dollars, which the court takes as the "basis" for determining the damages chargeable against the defendant, was the value of his claim to the entire tract. At the date of the valuation it does not appear that it was known that any portion of the claim was within this grant, and the fact that it was named in the

inventory and appraised as a seventy-two-acre tract is a presumption that it was not so considered.

The court, however, after finding that the original claim was for the seventy-two-acre tract, and that in the inventory it was valued as an entirety at the sum of six thousand dollars, finds that as Carman was the "owner" of only the forty-two-acre tract, the liability of the defendant for negligence is limited to this forty-two-acre tract, but takes as the "basis" of this liability the valuation which was placed upon the seventy-two-acre tract.

In this the court erred. It is not necessary for us to determine upon this appeal whether in an action by the heir against the executor, after distribution, for a *devastavit* the inventory filed in the probate court is competent evidence of the value of the property included therein, since we are satisfied for other reasons that the inventory was improperly considered by the court at the trial of the present cause. Upon the settlement of his accounts in the probate court the executor is chargeable " with the whole of the estate of the decedent which may come into his possession at the value of the appraisement contained in the inventory," unless he shall exonerate himself as provided by the statute. (Code Civ. Proc., sec. 1613.) This inventory is, however, only *prima facie* evidence of the value of the estate (Woerner's Law of Administration, sec. 320); and as the inventory would be inadmissible as evidence of any matter not required to be expressed therein, so any valuation of property included therein would not be even *prima facie* evidence of the value of other property not therein specifically described or valued. In the present case, therefore, as the inventory offered related to a tract of land different in extent from that for which the court found that the plaintiff was entitled to recover the value from the defendant, the question of the competency of a proper inventory does not arise.

The court finds that the defendant never had actual possession of any part of the seventy-two-acre tract, and

its finding that until the first day of January, 1852, there was no adverse possession of the forty-two-acre tract "which could have prevented the defendant, as executor of said estate as aforesaid, from taking possession as such executor of the said last-mentioned tract of land" is equivalent to a finding that on and after the first day of January, 1852, there was such adverse possession, and that the defendant was thereby prevented from taking possession of the land. It is a general rule that the executor is *prima facie* liable only for such assets of the estate as come into his possession. (Williams on Executors, 1667.)

If the heir seeks to charge him for negligence in not taking possession of property belonging to the estate, the burden rests upon the heir to establish such negligence. The liability of the executor for his negligence is measured by the detriment sustained by the estate therefrom. If Carman's acts in his lifetime gave him no right to the portion west of the San José road, and his estate had no right thereto by reason of the fact that the land belonged to the Noe grant, it was not incumbent upon the defendant to attempt to get possession of it, and the value of that portion of the seventy-two-acre tract could form no element in determining the damage sustained by his failure to obtain possession of the tract on the east side of the road. If the defendant was liable to the plaintiff in damages to any extent upon the facts shown at the trial, — and upon this point we express no opinion, — his liability was to be measured by the value of that portion of the land which was lost to the estate through his negligence, and it was incumbent upon the plaintiff to present competent proof of such value. If the estate lost only forty-two acres of land, the defendant was not liable for the value of seventy-two acres, nor could such value be made the "basis" for estimating the damages chargeable to the defendant.

There was no evidence before the court of the value of Carman's claim to the forty-two acres lying to the east of the San José road. The valuation of the seventy-two-

acre tract in the inventory was not susceptible of segregation for the purpose of fixing different values to different portions of the tract, much less could that valuation be applied by the court exclusively to the forty-two-acre tract. Taken by itself, the inventory could not form a basis for determining the value of the portion of the tract east of the road, and in the absence of any other evidence on the subject, the court had no basis for its decision, and its finding in that respect is unsustained by the evidence. The testimony offered at the trial with reference to the value of the land at a later date, as well as the finding by the court of the value of the forty-two-acre tract in 1866, is immaterial, and need not be considered, as such value did not enter into the basis adopted by the court in determining the damage sustained by the plaintiff, nor would the value at that date be the measure of the defendant's liability for a loss which was sustained by the estate in 1853.

The court also erred in adding compound interest to the sum found to be the value of the property lost to the estate through the negligence of the defendant. The general rule applicable to an executor, as well as to any other trustee, is, that, except in cases in which he has been guilty of some positive misconduct or willful violation of duty, he is not to be charged with compound interest. In cases of mere negligence, no more than simple interest is ever added to the loss or damage resulting therefrom. In cases where he has mingled moneys belonging to his trust with his own funds, and used them for his own advantage, courts have charged him with compound interest, upon the theory that in the absence of evidence to the contrary, he will be presumed to have received such profits from their use. (*Utica Ins. Co.* v. *Lynch*, 11 Paige, 520.) This rule is of modern growth, and is applied more frequently in this country than in England. It has been adopted, "not for punishing the delinquent trustee, but for the purpose of attaining the actual or presumed gains, and to make certain that nothing of profit or advantage remains

to the trustee, except, perhaps, his commission or compensation." (*Cruce* v. *Cruce*, 81 Mo. 684. See also Story's Eq. Jur., sec. 1277; Perry on Trusts, sec. 471; *Att'y-Gen.* v. *Alvord*, 4 De Gex, M. & G. 851; *Jones* v. *Ward*, 10 Yerg. 170; *Carney* v. *Saunders*, 16 How. 542; *Hook* v. *Payne*, 14 Wall. 257; *Schieffelin* v. *Stewart*, 1 Johns. Ch. 620; *McKnight* v. *Walsh*, 23 N. J. Eq. 146.) But even in such case, if the executor can show that he has acted in good faith, and has not made any greater profit by the use of the funds, he will be charged only simple interest. (*Perkins* v. *Hollister*, 59 Vt. 348.) The rule charging him with interest is, however, limited to cases in which it is either shown or presumed that the executor has himself profited by his acts, or has been guilty of such willful misfeasance as to justify the court in requiring from him compensation therefor.

Whether in any instance the executor is chargeable with even simple interest must be determined by the trial court from all the circumstances of that case. It cannot be said as matter of law that interest is to be added to the value of the property that has been lost by his neglect. The circumstances connected with its loss may so completely exonerate him from any charge of neglect that he would not be held liable for even its value, and his neglect may have been so technical that the court would not feel justified in requiring from him more than a restoration of the value of the property; and it has been held that the heir himself may have been so negligent in prosecuting his claim that the court would consider that the executor should not be charged with interest. (*Brinkley* v. *Willis*, 22 Ark. 1.)

The Civil Code fixes the measure of damages for the willful conversion of personal property to be its value at the time of conversion, with interest from that date. (Sec. 3336.) If a purchaser of land is evicted by paramount title, his recovery of damages is limited to the purchase price, with interest, and he cannot recover for any enhanced value which the land may in the mean time received. The negligence of the defendant

herein was of no higher grade than a simple tort result-
ing from non-feasance, and for the breach of such an
obligation the measure of damages is the amount which
will compensate for all the detriment proximately caused
thereby. (Civ. Code, sec. 3333.) We have not been
cited to any authority in which the liability of the ex-
ecutor for the loss of real estate has been determined.
In many states the executor does not have the charge
of the real property of his testator. In California, how-
ever, he is entitled to the possession of both real and per-
sonal estate. Both are placed by our statutes upon the
same footing. Upon a settlement of his accounts in the
probate court, the executor is chargeable " with the whole
of the estate of the decedent which may come into his
possession at the value of the appraisement contained
in the inventory," except as he may be exonerated in the
instances provided by the code. (Code Civ. Proc., sec.
1613.) The statute makes no distinction between real
and personal estate, and we think the rule applicable in
case of the loss by him of personal estate should have
equal application to a loss of real estate. His liability
cannot be any greater because relief is sought in another
forum than it would be if determined by the court which
has been especially constituted for settling his accounts.
As his liability for the loss of personal property would
be fixed at the date of the loss, so it must be for the loss
of real estate.

We do not think that the facts in the present case jus-
tify the application of any rule of punitory damages to
the defendant herein. Inasmuch as, very soon after the
death of Carman, Green took adverse possession of the
forty-two-acre tract of land, and the defendant never had
the actual possession of any part of the seventy-two
acres, and it does not appear that the executor at any
time had in his hands funds belonging to the estate with
which he could prosecute a claim for its recovery, there
is an entire absence of proof or presumption of advan-
tage to himself, or of wanton neglect of official duty.
We do not consider his acts in reference to the Santillan

grant indicative of any neglect or violation of his trust. That grant covered a very large tract of land, and its existence and extent was a matter of great notoriety. He had purchased it prior to the time when Carman caused his claim to be surveyed, and it appears from one of his letters to the plaintiff, written in 1852, that he informed Carman of this fact prior to said survey. If so, Carman made him his executor with the knowledge that his claim to the land was adverse to his own, and under these circumstances he cannot be held liable for misconduct in disposing of his own property.

It does not appear that the defendant was ever in possession of any portion of the land covered by the grant, nor was it shown that Wright, to whom he conveyed the same, or any one under him, ever took possession thereof; and it was shown that the tract in question was taken possession of very soon after Carman's death, and has since been held by other parties claiming under hostile claims. The conveyance by the defendant of his own land, or any grant by him in his individual capacity, could not transfer any interest which belonged to the estate of Carman. Under these circumstances, we think the court was not justified in attributing an official neglect or violation of duty on his part to the connection of the defendant with, or his acts relating to, the Santillan grant.

The court, however, fixes the date of his conveyance to Wright, viz., July 13, 1853, as the time when the land was lost to the estate, and also takes its value on that date, as found by it, to be the basis of the defendant's liability to the estate for the negligence by which such loss was sustained. This value was therefore the measure of the right of recovery for the defendant's negligence. Such liability would not be increased because twenty years elapsed after the loss had occurred. The plaintiff had the right to call the defendant to an account in the probate court at any time after the neglect by which the loss had occurred, and no facts are shown in the record excusing her from bringing her action imme-

diately thereafter.   Whatever liability the defendant had incurred was fixed at that date, and could not be increased by any neglect on the part of the plaintiff to call him to an account.   The court below assumed this to be the correct theory of fixing the basis of his liability, but, as we have seen above, erred in determining the amount of such liability, and adding thereto interest compounded each year for upwards of twenty years.

The order denying a new trial is reversed.

GAROUTTE, J., PATERSON, J., BEATTY, C. J., McFARLAND, J., and DE HAVEN, J., concurred.

Rehearing denied.